Fabricant, Judith, J.
INTRODUCTION
This action arises from the termination of the plaintiff, Israel Stein’s, employment with the defendant, Clinical Data, Inc. (CDI), and events thereafter. The motion now before the Court relates to discovery; CDI contends that Stein intentionally destroyed material evidence, in defiance of a court order for discovery; it seeks sanctions and a finding of contempt. For the reasons that will be explained, the Court will find that Stein did intentionally destroy data, and will order sanctions pursuant to Mass.R.Civ.P. 37.[1]
BACKGROUND
Stein, a physician, was a founder of CDI. He served in various executive positions with the company until August 30 of 2006, when he resigned, apparently in the context of a dispute over his changed role after the appointment of a new chief executive officer. His employment agreement entitled him to severance pay and benefits, and obligated him to refrain from certain conduct for a one-year period, including competing with the company, using or disclosing its trade secrets and confidential business information, and soliciting its employees. The company began paying Stein the agreed severance upon his resignation.
Beginning sometime in 2006, CDI was preparing to sell its Vital Diagnostics Division, including a foreign subsidiary known as Vital Scientific N.V, through a private auction process conducted by Lazard Freres and Company, LLC. In early 2007, CDI formed the belief that Stein was engaging in communication with potential bidders in the auction process in a manner that interfered with the process, and that in doing so he had used and disclosed confidential and proprietary business information of CDI. The company sent Stein a letter, in March of 2007, demanding that he *270 stop such conduct, and threatening action against him.
Thereafter, the parties negotiated a settlement agreement. The settlement agreement provided that Stein would provide an affidavit detailing his communications with participants in the auction process, and the parties would exchange mutual releases. Stein did offer an affidavit, but CDI did not accept it, contending that it was both late and incomplete. The company terminated Stein’s severance pay and benefits.
Stein brought this action on August 3, 2007. His amended complaint, filed on April 29, 2008, asserts claims of breach of his employment agreement (count I), breach of the settlement agreement (count II), breach of the implied covenant of good faith and fair dealing (count III), violation of the Massachusetts Wage Act (count IV), violation of G.L.c. 93A (count V), and promissory estoppel (count VI), along with claims for declaratory judgment as to the binding nature of the two agreements (count VII) and specific performance of both (count VIII).
CDI responded to the amended complaint, on May 5, 2008, with its answer and counterclaim, which it amended on September 25, 2008.[2] In answer to Stein’s claims, CDI asserts, among other defenses, that Stein’s breaches excused it from further performance. In counterclaim, CDI alleges that Stein’s affidavit failed to make full disclosure as required by the settlement agreement. Further, the counterclaim alleges that Stein interfered with the auction process, and used and disclosed confidential information of CDI in doing so, in violation of his employment agreement. In particular, CDI alleges that Stein assisted a group of management employees of Vital Scientific in their effort to prepare to bid for the company, and that he attempted to dissuade other potential bidders, particularly an entity known as Transasia. As a result, CDI alleges, the auction process failed, causing a substantial loss to CDI.
The counterclaim also alleges that Stein consulted for competitors of CDI, in particular an entity known as Epidauros, both during his employment and within the year after his termination, in violation of his employment agreement, and used CDI’s confidential information in doing so. Finally, the counterclaim alleges that Stein, in violation of his employment agreement, solicited Richard Driver to leave his employment as CDI’s chief scientist. Based on those allegations, the counterclaim asserts claims of breach of the employment agreement and the settlement agreement (counts I and II), breach of the implied covenant of good faith and fair dealing (count III), breach of fiduciaiy duty (count IV), tortious interference with advantageous relations (count V), and misappropriation of trade secrets (counts VI and VII).
The parties proceeded to conduct discoveiy, punctuated by a series of disputes that were presented to the Court for resolution. A particularly intense dispute arose with respect to CDI’s request for production of Stein’s e-mail communications with various people involved in the auction process, with entities for which CDI alleges Stein provided consulting services, and with Richard Driver. CDI first requested communications relating to the auction process and to consulting with competitors in its first request for production of documents, dated September 25, 2007. It submitted a second request, relating specifically to Driver, dated September 19, 2008. Stein produced certain documents responsive to the first request in November of 2007, but refused certain aspects of the request. In response to a motion to compel from CDI, the Court on June 11,2008, ordered Stein to produce e-mail communications with five named potential competitors. Stein produced additional documents in October 2008, but CDI remained convinced that Stein’s production was incomplete, both because of the small quantity of materials produced, and because of discrepancies between those materials and corresponding materials CDI received through discoveiy from third parties.
On November 20, 2008, CDI served and filed an “Emergency Motion to Compel Plaintiff Israel M. Stein, M.D. to Preserve Electronic Records and to Produce His Computer and E-Mail Accounts for Forensic Inspection.” CDI contended that documents produced in response to subpoenas to third parties revealed that Stein’s production of his e-mails was incomplete, and that Stein had withheld incriminating documents and/or tampered with documents he did produce by making undisclosed redactions. To remedy that conduct, CDI sought an order prohibiting Stein from deleting e-mails from his personal computer and from his web-based e-mail service, and requiring him to submit his personal computer for forensic examination and to produce all e-mails stored on his web-based e-mail service.
The Court heard CDI’s motion on November 25,2008. Stein’s position at argument was, in substance, that he had met his discovery obligations, that the purported discrepancies between his production and the documents CDI had received from third parties did not establish any misconduct on his part, and that the relief sought would be an unwarranted invasion of his privacy.[3] After lengthy argument and discussion, the Court stated, “I am not, based on materials that are before me, I am not finding that Dr. Stein has in any way failed to comply with his discovery obligations. I don’t think that has been established here... I’m not making the finding that there has been a failure to meet obligations or that there has been any sort of deliberate effort to conceal or to manipulate.”[4] The Court nevertheless ordered, “in the interest of moving this forward,” that Stein refrain from deleting any e-mails from the relevant period of time,[5] and that he submit his personal computer for forensic examination.
Counsel agreed to designate the period of September 1, 2006, through August 31, 2007, as the relevant period, and then reached agreement in substance on a *271 protocol for the examination, using a set of agreed search words, and providing Stein’s counsel an opportunity to review all documents identified for relevance and privilege before they would become available to CDI’s counsel. After receiving conflicting proposed orders, the Court entered a written order, dated December 5, 2008, in the form proposed by CDI.[6] The order set out the protocol for the forensic examination, and directed Stein to turn over his computer by December 16, 2008.
Stein missed the deadline, but did submit his computer on December 30, 2008.[7] CDI’s forensic computer expert, Stephen Swanson, examined the computer, and made a startling discovery: it contained no e-mails from the relevant period of time. What the computer did contain was evidence indicating that, between November 20, 2008, when CDI served its motion seeking examination of the computer, and November 30, 2008, the program “Drive Scrubber 3" was installed and run on the computer three times, on November 23, 24, and 29, and then removed from the computer. The effect was to remove from the computer permanently whatever pertinent materials may have been present there as of the date of the motion. Thereafter, Swanson’s examination revealed, a new operating system, Windows Vista, was installed on the computer three times, on November 30, 2008, again on December 24, 2008, and again on December 28,2008.[8] Swanson’s examination also revealed the use of registry cleaning software on November 24, 2008, twice on December 28, 2008, and again on December 29, 2008; such software tends to, but in this instance did not, remove evidence of the use of scrubbing software.[9]
On February 11, 2009, CDI served the present motion, which seeks sanctions against Stein, including an order dismissing Stein’s claims, entering default judgment against Stein on CDI’s claims, scheduling a hearing on assessment of damages on those claims, and ordering Stein to pay CDI’s costs and attorneys and expert fees related to the motion and the forensic examination.
In response, Stein served an affidavit denying any intentional destruction of relevant evidence, and asserting that he installed and ran the Drive Scrubber 3 program not in an effort to delete any discoverable material, but in an innocent effort to clear space in preparation for upgrading his computer by installing Windows Vista, so as to make his computer more compatible with other users. He also, for the first time, asserted that since March 2008 he had been running McAfee Quick Clean software with Shredder, configured to erase all deleted e-mails from the computer automatically every seven days; thus, he contended, all e-mails from the relevant period would have been erased automatically prior to November 20, 2008, and would have been unaffected by the use of Drive Scrubber 3. He further asserted that he did not delete “any relevant e-mails or documents or files” after November 20, 2008, and that after November 25, 2008, he did not delete any e-mails or files “concerning CDI, the auction process, potential bidders, Epidaurus, Richard Driver, or my employment agreement during the period September 2006 through September 2007.” He denied that his activities in November and December 2008, were occasioned by CDI’s motion and the Court’s order, asserting that “I learned of the emergency motion after I began considering and planning to upgrade to Vista.” Stein further asserted that he makes a practice of placing e-mails he wishes to save in an archive file and then deleting the archive files when he needs space, and that he deleted archives from before 2008 “prior to November 20, 2008 because of a need for space.” Before deleting them, however, he printed all e-mails that he had saved and gave them to his attorneys.
Stein’s affidavit triggered a supplemental affidavit of Stephen Swanson. According to Swanson, the use of Drive Scrubber 3 would not increase the amount of available hard drive space; space occupied by deleted material would already be available to be overwritten. The easiest way to increase available space, Swanson opines, is to delete unnecessary files. The files on Stein’s computer as of November 23, 2008, according to Swanson, included 12 gigabytes of movies, of the computer’s total 74.4 gigabyte capacity. As of the time of Swanson’s examination, the files on the computer also included three identical sets of photographs, two of which were created on November 22, 2008, and November 24, 2008. According to Swanson, Stein could have freed up more than enough hard drive space to accommodate Vista by deleting some of these files, without deleting any e-mail files. Stein also could have copied all of his archived e-mails onto a compact disc or USB flash drive before installing Vista, as recommended by instructions on the Windows website. CDI’s reply to Stein’s opposition to its motion also points out that the 39 pages of e-mails Stein had produced to CDI on October 29, 2008, purportedly taken from his computer, did not appear on the computer during Swanson’s examination.[10]
On April 30, 2009, while CDI’s motion was awaiting hearing, CDI completed Stein’s deposition. At the deposition, Stein testified, for the first time, that he had put his e-mail archives on a series of CDs over a period of time, on advice of his counsel, and that at some time before November of 2008 he had copied them onto one CD, which, at some time “in the last six, seven months,” he had given to his counsel. He did not know whether he still had the CDs from which he had made the one he gave to counsel.[11] Stein’s testimony triggered a request to Stein’s counsel to produce the CD in counsel’s possession. Counsel confirmed that he had it and would preserve it, but refused to produce it.
The Court heard argument on CDI’s motion on August 10, 2009.[12] Stein’s counsel confirmed that he had a CD, given to him by Stein, that he understood *272 to contain a compilation of Stein’s e-mails for the relevant period. The Court ordered counsel to produce the CD in his possession for examination by Swanson under the same protocol that the Court had ordered for examination of Stein’s computer, and also ordered Stein to search for and produce any CDs or other media in his possession containing e-mails from the relevant period.[13] The Court scheduled further hearing for September 15, 2009.
Counsel turned over the compilation CD, and Stein turned over three more CDs, which he identified as the sources from which he had made the compilation. Examination of the CDs triggered a further round of affidavits and other submissions. In a “Second Supplemental Affidavit,” Swanson stated that his examination of the compilation CD yielded e-mails for the period October 2006 through August of 2007, but none for September 2006.[14] The e-mails included hundreds that were responsive to his keyword search. He determined that the archives were copied to the CD on February 17, 2009. He examined the other CDs Stein provided to determine whether they were the source from which the archives were copied to the compilation, and concluded that they were not. From the materials available to him, he could not identify the source from which the material on the compilation CD was copied to it.
In advance of the September 15, 2009, hearing, CDI submitted a supplemental memorandum, to which were appended samples of the e-mails obtained from the compilation. They include previously undisclosed material of substantial relevance to the disputed claims, including communications between Stein and members of Vital Diagnostics’ management team regarding that group’s preparations to participate in the auction process; communications between Stein and Transasia, Epidauros, and Richard Driver during the relevant period; and complete versions of e-mails that Stein had previously produced in incomplete form. CDI also pointed out that, while these proceedings were going on, the parties completed all other discovery, including taking depositions in Europe pursuant to the procedures prescribed under the Hague convention, during which CDI did not have the opportunity to inquire about the e-mails it has only now obtained.
At the hearing on September 15, 2009, Stein provided a supplemental affidavit, in which he asserted that the three CDs he had turned over “to the best of my knowledge and belief were some of the disks that I used to create the single compilation disk of e-mails on February 17, 2009,” a date he “nowrecall[ed]” after having read Swanson’s most recent affidavit. He further asserted that he had formerly had additional disks containing archived files “that I used to print e-mails in hard copy for production in this case or used to create the compilation disk,” but that he could not locate those additional disks, and that, in particular, he could not locate the disk containing materials from September of 2006. He now recalled also that “I had the source disk with e-mails from September 2006 in my possession in October 2008 when I printed and produced e-mails concerning Richard Driver.” He insisted that he had used the disks he had turned over to create the compilation disk, despite Swanson’s determination to the contrary, and that he had never “doctored or altered any e-mail messages that I printed.”
Stein went on to assert his extreme concern for his own and his family’s personal privacy, stating that “I never intended to hide or destroy any information relevant to this case. I just could not trust CDI with my private personal information.” He reiterated his denial of any effort to destroy relevant material, and stated “I ran the programs on my computer starting on [sic] November 2008 as part of the upgrade to Vista and to make sure that CDI did not obtain any of my sensitive personal information contained on my computer, to avoid an invasion of my privacy. I never violated any order imposed by this Court and never intended to delete or destroy any relevant evidence in this case.” He expressed regret that he did not disclose the existence of the disks sooner, stating, “But, my privacy is paramount.”
FINDINGS OF FACT
As the recitation of the background supra indicates, most of the facts pertinent to this motion are not disputed, but some are. Having carefully reviewed all of the materials submitted, and considered the arguments of counsel, the Court resolves those disputes as follows.[15]
From the time Stein received CDI’s demand letter in March of 2007, he knew that CDI was accusing him of violations of his employment agreement since his resignation on August 30, 2006, and that it was contemplating litigation. From that time forward, and certainly by the time he himself filed suit in August of 2007, Stein knew or should have known that his e-mail communications with third parties actually or potentially involved in CDI’s business, or competing with it, from the time of his resignation forward, would be at least potentially relevant to the litigation. That knowledge gave rise to a duly on Stein’s part to act scrupulously and carefully to preserve all such materials. He also had a duty, under the Massachusetts Rules of Civil Procedure, to produce such materials when requested in discovery, absent an order of the Court relieving him of that obligation.
Stein did not comply with those duties; indeed, he did the opposite. In the fall of 2007, Stein responded to CDI’s discovery request by making a production that has now been shown to have been substantially incomplete. He then, by his own admission, in March of 2008, installed on his computer a shredding program that automatically erased deleted e-mails every seven days.[16] He did so without seeking leave of Court, and without disclosing that activity to CDI or, apparently, to *273 his counsel. At some time — it remains unclear when— he placed some of his e-mails into archives and copied those archives onto disks. He did not, however, if his current version of events is to be believed, take appropriate steps to preserve those disks so as to make sure they would be available if necessary for discovery.[17]
In November of 2008, upon receiving service of CDI’s motion seeking examination of his computer, Stein immediately undertook a two-pronged strategy: while his counsel vigorously resisted entry and enforcement of an order to turn over the computer, never mentioning (apparently because Stein had failed to disclose to him) either the use of the McAfee program or the existence of the CDs, Stein himself engaged in a series of steps to wipe the computer clean of everything that might remain on it that would be relevant to this dispute, so that the examination, if eventually performed, would be futile.[18] The Court does not credit Stein’s explanation of those efforts as an innocent upgrade.[19] The timing is too coincidental, and Stein’s statements are too contradictory. The Court finds, rather, that Stein’s motivation was, as he now acknowledges, “to make sure that CDI did not obtain any of my sensitive personal information contained on my computer, to avoid an invasion of my privacy.”[20] Viewing his own privacy interest as “paramount,” Stein took it upon himself to decide what was relevant, and what was too private and sensitive to risk disclosure, acting in utter disregard of his obligations and of the authority of the Court.
Only when his conduct as to the computer had been revealed, and he was faced with the prospect of sanctions, did Stein acknowledge first the erasures resulting from the use of the McAfee program, and later, the existence of the CDs. Even then, however, he apparently still hoped to avoid full compliance with his obligations, withholding the CDs and their contents for some five more months from the time he first disclosed their existence at his deposition in April, until after the Court ordered them turned over in August. When finally produced, the CDs revealed the existence of yet another storage medium that has not been provided, the source from which Stein made the compilation CD in February of 2009. There can be no question that, as of that date, Stein fully appreciated both his obligation of preservation and the potential consequences of his failure to meet that obligation, yet he again did not take steps to preserve and produce that still unidentified source.
Stein’s conduct has caused substantial harm. CDI has expended as yet unquantified, but obviously substantial attorney time and expert fees. The Court has conducted three hearings, reviewed voluminous materials, and entered three orders including this one. More important, Stein’s conduct has impaired CDI’s ability to conduct effective and timely discovery and to defend Stein’s claims and prosecute its own claims fairly, and has impaired the Court’s ability to adjudicate both sides’ claims justly. Stein’s e-mails from September 2006, a time of undisputed relevance to the events in issue, appear to be gone forever, unless he finds yet additional CDs or other storage media hereafter. As to the remainder of the relevant time, although pertinent materials have now been recovered, there is no way to determine whether those materials are all that existed before Stein’s destructive activities. Despite a long and expensive discovery process, including depositions conducted in Europe, CDI has not had the opportunity to use the clearly relevant materials it has now recovered during depositions. Overall, Stein’s conduct has caused substantial prejudice to CDI, as well as waste of its and the Court’s resources.
RULINGS AND DISCUSSION
“(O)nce a litigant knows or reasonably should know” that evidence “might be relevant to a possible action,” the law imposes on the litigant “a duty to preserve such evidence in the interests of fairness.” Fletcher v. Dorchester Mut. Ins. Co., 437 Mass. 544, 550 (2002); see also Gath v. M/A Com, Inc., 440 Mass. 482, 486-91 (2003). A litigant who fails to comply with that duty, whether willfully or negligently, is subjéct to sanctions for spoliation of evidence. See Kippenham v. Chaulk Serv., Inc., 428 Mass. 124, 127 (1998) (“Sanctions may be appropriate for the spoliation of evidence that occurs even before an action has been commenced, if a litigant. . . knows or reasonably should know that the evidence might be relevant to a possible action”).
The doctrine of spoliation is “based on the premise that a parly who has negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding should be held accountable for any unfair prejudice that results.” Westover v. Leiserv, Inc., 64 Mass.App.Ct. 109, 113 (2005). “Once spoliation has been established, the judge has the discretion to craft a remedy addressing ‘the precise unfairness that would otherwise result.’ ” Id., quoting Fletcher v. Dorchester Mut Ins. Co., 437 Mass. at 549-50. The remedy chosen may include “instructing the juiy on the adverse inferences that may be drawn from spoliation.” Gath v. M/A-Com, Inc., 440 Mass. at 488 (2003). “As a general rule, a judge should impose the least severe sanction necessary to remedy the prejudice to the nonspoliating party.” Westover, 64 Mass.App.Ct. at 113, quoting Keene v. Brigham & Women’s Hosp., Inc., 449 Mass. 223, 235 (2003) (internal quotation marks omitted).
Here, as discussed supra, Stein’s conduct has imposed substantial unnecessary costs on CDI, and has significantly prejudiced its position in the litigation. In the Court’s view, the least severe sanction necessary to remedy the prejudice to CDI is the following, which the Court will order. First, the Court will order all of Stein’s affirmative claims dismissed, since, having violated his obligations to the Court, he cannot fairly seek affirmative relief from the Court. Second, the Court will order that Stein pay all costs reasonably incurred by CDI for attorney time, expert fees, and other expenses in connection with its efforts to obtain discovery of Stein’s e-mails, *274 beginning with the preparation of the motion it filed on November 20, 2008. Third, at trial of CDI’s claims, the Court will permit CDI to introduce evidence of Stein’s conduct as set forth herein, and will instruct the juiy that it may infer from that conduct that additional relevant materials existed but have not been recovered or produced, and that such materials would have provided evidence of facts inconsistent with Stein’s position with respect to CDI’s claims.
CONCLUSION AND ORDER
For the reasons stated, Clinical Data, Inc.’s “Motion for Sanctions and Finding of Contempt Against Plaintiff Israel M. Stein, M.D. for Violating Court Order and Intentionally Destroying Evidence” is ALLOWED insofar as it seeks sanctions pursuant to Mass.R.Civ.P. 37. The Court orders the following as sanctions:
(1) All claims set forth in the plaintiffs amended complaint, not previously dismissed by stipulation, shall be dismissed.
(2) Plaintiff shall pay to defendant all costs reasonably incurred by defendant for attorney time, expert fees, and other expenses in connection with its efforts to obtain discovery of plaintiffs e-mails, beginning with the preparation of defendant’s November 20, 2008, “Emergency Motion to Compel Plaintiff Israel M. Stein, M.D. to Preserve Electronic Records and to Produce His Computer and E-Mail Accounts for Forensic Inspection.” Defendant shall serve on plaintiff, within fourteen days, a motion seeking a specific amount, accompanied by an affidavit detailing such costs and expenses; plaintiff may respond within ten days thereafter, identifying any specific objections to costs or expenses claimed; plaintiff shall thereafter file the affidavit and response with the Court in the manner provided by Superior Court Rule 9A.
(3) At the trial of defendant’s counterclaims, the Court will permit CDI to introduce evidence of Stein’s conduct as set forth herein, and will instruct the juiy that it may infer from that conduct that additional relevant materials existed but have not been recovered or produced, and that such materials would have provided evidence of facts inconsistent with Stein’s position with respect to CDI’s claims.
The clerk is directed to schedule a final pretrial conference at the earliest available date.

The Court declines CDI’s invitation to treat this matter as contempt, finding the remedies available under Rule 37 sufficient.

On September 8, 2008, the parties filed with the Court a stipulation, in which they agreed to dismissal of certain of the claims previously pled on both sides.

Notably absent from Stein’s argument at that time was any suggestion that his e-mail communications from the relevant time period would no longer appear on his personal computer because of a routine archiving and deletion process, or for any other reason.

It bears noting that the Court did not find that Stein had complied with his obligations — the Court made no finding either way on this issue.

The Court commented that “I would think he would have understood that he had that obligation whether I ordered it or not,” to which Stein’s counsel replied, “I’ll represent that to the Court.”

Stein preserved his overall objection to the examination, and also asserted objections to certain aspects of the order the Court entered.

On December 10, 2008, Stein filed a motion for reconsideration, which this Court denied. He then, on December 17, 2008, filed an application for interlocutoiy review, which the single justice of the Appeals Court denied. Finally, on Januaiy 14, 2009, Stein filed an “Emergency Motion to Revoke this Court’s Order Regarding Protocol for Forensic Inspection of Plaintiffs Computer’s and E-mail Accounts,” which this Court denied.

The computer did contain archived e-mails for a pertod in 2008, but none for the relevant period.

Swanson acknowledged that registry cleaning software also serves to improve the functioning of the operating system, and is used for that purpose.

Some of those documents were the ones that CDI had contended were redacted, giving rise to the motion CDI filed on November 20, 2008.

Stein also testified at the April 30, 2009, deposition that he had retrieved the e-mails he produced in October of 2008 directly from his personal computer.

The docket does not explain, and the Court is not aware of, any reason for the delay in hearing from the filing of the motion on March 20, 2009.

At the hearing Stein submitted an affidavit of his forensic computer expert, Richard Smith. Smith did not express any disagreement with Swanson. He confirmed that “multiple attempts to upgrade Dr. Stein’s computer to the Vista operating system were made beginning on November 30, 2008,” and that installation would require approximately 14.5 gigabytes of space. He confirmed also that McAfee Quick Clean software had been installed on Stein’s computer in March of 2008, configured to shred deleted e-mails automatically every seven days. He stated also that the Drive Scrubber 3 program would have had no effect on deleted e-mails that had already been overwritten by the McAfee Shredder software.

Swanson refers to them as DVDs. The difference does not appear material.

At the most recent hearing, on September 15, 2009, Stein declined the opportunity for an evidentiary hearing.

What was actually erased thereby depends on what had been deleted prior Stein’s activities in November and December of 2008; that is impossible to determine at this stage.

The alternative interpretation is worse: contrary to his sworn statements, he still has them, and knows where they are, but continues to withhold them.

The Court does not suggest that Stein’s counsel knew of Stein’s activities at the time, or that counsel’s conduct in resisting CDI’s motion and seeking review of the Court’s order was improper.

Even if Stein’s motive had been to upgrade, his conduct would have been in violation of his obligations, since he knew or should have known that the upgrade would destroy material on the computer that he had an obligation to preserve.

The Court construes this reference to “sensitive personal information” to include evidence of the conduct that forms the basis of CDI’s claims, and undermines Stein’s own claims in this case.